1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

|  |  |  |
|---|---|---|
| DAVID EVANS O'NEIL, JR., | ) | Case No.: 1:14-cv-00432-BAM |
| Plaintiff, | ) ) | **ORDER REGARDING PLAINTIFF'S** |
| v. | ) ) | **SOCIAL SECURITY COMPLAINT** |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) ) | |
| Defendant. | ) ) | |
| | ) | |

**INTRODUCTION**

Plaintiff David Evans O'Neil, Jr. ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Barbara A. McAuliffe. The Court finds the decision of the Administrative Law Judge ("ALJ") to be supported by substantial evidence in the record as a whole and based upon proper legal standards. Accordingly, this Court affirms the agency's determination to deny benefits.

///

///

///

**FACTS AND PRIOR PROCEEDINGS**

On February 9, 2009, Plaintiff filed an application for disability insurance benefits.  AR 231-234.[1]  Plaintiff alleged that he became disabled on October 3, 2006.  AR 231.  Plaintiff's application was denied initially and on reconsideration.  AR 142-145, 147-151.  Subsequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  ALJ Peter Belli held a hearing on July 22, 2010, and issued an order denying benefits on October 28, 2010.  AR 80-118, 121-135.  Plaintiff sought review of the ALJ's decision and the Appeals Council remanded the action back to an ALJ.  AR 136-141.  Following remand, ALJ Timothy Snelling held a hearing on May 3, 2012, and issued an order denying benefits on August 3, 2012.  AR 30-45, 51-79. Plaintiff sought review of the ALJ's decision, which the Appeals Council denied, making ALJ Snelling's decision the Commissioner's final decision.  AR 1-4, 24.  This appeal followed.

**Plaintiff's Testimony and Hearing Evidence**

*Written Statement*

In a written statement prepared in August 2009, Plaintiff reported that he cannot sleep for more than three hours at time because of lower back, knee and right hip pain.  Plaintiff has difficulty dressing and needs help washing his feet.  He cannot cook, but will make sandwiches.  He is not able to perform house or yard work because he is in too much pain to walk, kneel, crawl, sit, run or climb. Plaintiff goes out every day and can drive a car.  However, he cannot go out alone because he needs help carrying things and has a hard time getting out of the car.  Plaintiff does not shop in stores, but will wait in the car while another person shops.  He does not participate in social activities because he is in too much pain.  Plaintiff reports that his condition affects his ability to lift, squat, bend, stand, reach, walk, sit, kneel, stair-climb, complete tasks and get along with others.  Plaintiff's knees, lower back and right hip hurt lifting 10 to 15 pounds.  He cannot squat, bend or kneel, but can stand 15 to 30 minutes, walk 50 to 75 yards and sit 15 to 30 minutes.  He can pay attention and follow written and spoken instructions.  He sees a therapist and has anger, depression and mood swings.  He uses a cane for walking, which was prescribed after left knee replacement in October 2008.  AR 298-305.

---

[1]   References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

*July 2010 Hearing*

ALJ Peter Belli held a hearing on July 22, 2010, in Reno, Nevada.  AR 80-118.  Plaintiff appeared and testified.  He was represented by attorney Dennis Cameron.  Impartial Vocational Expert ("VE") Jim Van Eck also appeared and testified.  AR 82-83.

In response to questions from the ALJ, Plaintiff testified that he last worked in 2007 and is a high school graduate.  He is 5'11" and weighs 240 pounds.  He smokes one pack of cigarettes a day and occasionally drinks alcoholic beverages.  In his lifetime, he has used recreational drugs, including meth and cocaine.  He currently has a cannabis card for "medication marijuana," which he takes for pain.  AR 86-87.  Plaintiff's primary care physician at the VA did not write the marijuana prescription, had no opinion regarding the marijuana and did not say Plaintiff could not use it.  AR 87-88.  A pain doctor, Joseph Garfinkel, MD, provided the recommendations for marijuana.  Plaintiff has seen Dr. Garfinkel twice in two years, i.e., once a year.  Dr. Garfinkel does not provide Plaintiff with treatment, just a marijuana recommendation.  In addition to the marijuana, Plaintiff also takes Vicodin and a stomach pill.  AR 89-93.

Plaintiff received orthoplasty on his left knee in 2008.  He is not scheduled for any other surgery, except to remove warts.  He has not been to an emergency room for any type of treatment in the last twelve months.  In response to the ALJ's questioning about his medical problems, Plaintiff testified that his left and right knees and his back hurt.  He had lower back surgery in 1987.  AR 93-94. Plaintiff also is currently under the care of a psychiatrist, psychologist, or psychiatric social worker at the VA.  He takes psych medications for depression.  AR 94-95.

In response to questions about his activities of daily living, Plaintiff testified that he goes to bed at 8:30, wakes at 3:30, returns to bed and gets up at 5:30 because of pain.  He wakes at 3:30 so he can move and gets up at 5:30 because his back starts to hurt.  After he wakes up, he sits in his bed and then gets some coffee.  He does nothing all day, just sitting and lying around.  When he gets tired of sitting and his back hurts, he lies down.  Plaintiff reported that he has been on unemployment since 2009.  When he signed the form for unemployment, he told them that he was ready, willing and able to work.  Since 2009, he has signed a statement each month that he is ready, willing and able to work. AR 95-96.  When asked why he would tell them he was ready, willing and able to work, but was

telling the ALJ he was unable to work, Plaintiff indicated that he liked to eat and have a place over his head.  Plaintiff explained that he applied for Medi-Cal and services, but they told him he could not have anything until he used up his unemployment.  They filed it for him.  Plaintiff is not drawing a pension from the VA, but has VA medical.  He has not applied for disability benefits from the VA because he does not qualify.  Plaintiff did not talk with anybody about the fact that he has to sign, under penalty of perjury, that he is ready, willing able to work.  He files a statement every month that he is looking for a job.  AR 96-99.

Plaintiff testified that he can bathe himself, but has a hard time getting out of the tub and washing his feet.  He can dress and shave himself.  He does not wear shoes because it is too hard to put them on.  He can buckle a belt, button buttons, operate a zipper and use a knife, fork and spoon.  AR 99-100.

Plaintiff indicated that he was prescribed a cane to use as needed.  Plaintiff reported that he uses it all the time.  He does not wear a brace or use any type of back support.  AR 101.

Plaintiff testified that he drives a car three or four times a month.  A friend drove him from Modesto to Reno.  He was in the car for 45 minutes to an hour before they would stop and stretch.  AR 102.

In response to questioning about his last job, Plaintiff testified that he was a pressman for the Modesto Bee.  He worked at the Bee for 14 years, 4 or 5 years as a pressman, 2 or 3 years as a plate maker, 2 or 3 years in the camera room, and 4 years as a paste-up artist.  Before working at the Bee, he worked for Brown Printing as a lithographic stripper, pre-press for about 10-15 years.  AR 102-106.

Plaintiff also testified that he would be returning to the doctor for a colonoscopy for colon cancer.  He had surgery a month earlier to remove polyps.  Plaintiff was told that he had early signs of cancer.  AR 106-107.

In response to questions from his attorney, Plaintiff testified that his jobs at the Modesto Bee were sitting jobs that required the use of both hands.  When Plaintiff stands for long periods of time, he uses the cane for support.  He could stand without the use of his cane for three or four minutes.  If working at a stand-up job, he would need one hand on his cane.  He usually holds the cane in his right hand, but occasionally switches.  AR 108-109.

Plaintiff also testified that he suffers from post-traumatic stress disorder for which he receives treatment.  Additionally, he has been diagnosed with depression.  He isolates himself every day and does not go out because he does not feel like it.  His body hurts and he cannot stand people.  He has anxiety attacks three or four times a week.  When he gets anxiety, he will go to his room, sit and just rock and rock and rock.  Plaintiff further testified that he has problems with anger, becoming very verbally abusive.  He sees a psychologist or psychiatrist at the VA for his anxiety.  He also attends one-on-one counseling for about an hour once a month.  AR 108-112.

In response to questions about his abilities, Plaintiff testified that he can walk about 10-20 yards without his cane.  He can walk the length of a football field with his cane.  He can stand without the use of his cane for four or five minutes.  With the cane, he can stand about 10 to 15 minutes.  If he had a job that allowed rotating siting and standing, he would need to move around after 10 or 15 minutes.  On an average day, he lies down between four and five hours total.  He usually will lie down for an hour or 45 minutes at a time.  AR 112-114.

Following Plaintiff's testimony, the ALJ elicited testimony from the vocational expert ("VE") Jim Van Eck.  AR 114.  The VE testified that Plaintiff's past work was classified as newspaper pressman and lithographic stripper.  AR 118.  The ALJ did not have enough information to ask a hypothetical.  AR 115.

*May 3, 2012 Hearing*

Following remand, ALJ Timothy Snelling held a hearing on May 3, 2012, in Stockton, California.  AR 51-79.  Plaintiff appeared in person, with his attorney, Dennis Cameron, available by telephone.  Impartial Vocational Expert ("VE") George Meyers, along with Medical Experts ("ME") Daniel H. Wiseman and Herbert Tanenhaus, appeared and testified.  AR 53.  At the outset of the hearing, Plaintiff amended his alleged onset date to November 7, 2007.  AR 55.

In response to questions from the ALJ, Dr. Wiseman testified that he specializes in pediatric and adult pulmonary medicine and is board certified in pediatrics.  Dr. Wiseman reviewed the medical evidence in this matter and believed that there was sufficient medical evidence to reach conclusions to a reasonable medical certainty.  AR 56-57.  Dr. Tanenhaus testified that he is a board certified

psychiatrist and has testified in multiple disability hearings.  He had reviewed the medical records and felt they were sufficient for him to render an opinion.  AR 57-58.

When asked about Plaintiff's physical impairments, Dr. Wiseman testified that Plaintiff's biggest physical problems are the left knee, lower spine with some thoracic and cervical spine degenerative disease as well.  Plaintiff is modestly overweight, which contributes to the stress the spine experiences.  Dr. Wiseman did not believe that Plaintiff fully equaled any listing, but would recommend the skeletal muscular listing of 1.02, major dysfunction of joints.  AR 59.

At the hearing, Plaintiff was using a cane with an arm brace to the elbow.  Plaintiff testified that it was recommended by a physical therapist and okayed by the VA.  He received it about three months prior to the hearing.  AR 59-60.

In response to further questioning by the ALJ regarding Plaintiff's functional limitations, Dr. Wiseman referred to Dr. Gasparre's evaluation of May 12, 2009, in which he believed Plaintiff could lift/carry 50 frequently, 25 occasionally, stand/walk/sit for six hours in an 8-hour workday, but would need to get up and move.  According to Dr. Wiseman, Dr. Gasparre did not think there were any major movement limitations, but Plaintiff would have some difficulty with kneeling, crawling, anything that required he bend his knees severely, and balancing.  Dr. Wiseman indicated that the description was from several years ago and posited that things may have advanced since that time.  However, Dr. Wiseman reported that more recent ones speak the same way.  AR 60-61.  Dr. Wiseman relied on this opinion because it was from one of the independent physicians who had been the most thorough and went to the issue of RFP or the ability function.  Dr. Wiseman also reported that the psychological examination by Dr. Wildman in October 2009 contained some physical descriptions essentially consistent with Dr. Gasparre, including Plaintiff's ability to take walks and walking a dog.  AR 61-62.

When asked by Dr. Wiseman how he got from the car to the court, Plaintiff testified that he walked with his cane about 10 yards, which was difficult, and he took a ramp.  AR 62.  Dr. Wiseman opined that there are times when Plaintiff can manage reasonably well and times when he has had greater difficulty.  Dr. Wiseman indicated that this was not surprising or unusual because disk disease and most orthopedic conditions wax and wane.  AR 62.  Dr. Wiseman placed Plaintiff in a light exertional category, but noted that Plaintiff had been living a sedentary lifestyle.  Dr. Wiseman

believed that Plaintiff might need a period of time to restore his muscle strength and abilities to a light level, but could be capable of it given the opportunity and some support systems.  AR 63.

When asked about non-exertional limitations, Dr. Wiseman did not know the status of Plaintiff's hearing.  With respect to postural limitations, Dr. Wiseman endorsed the descriptions by Dr. Gasparre, indicating that there is a good constant in the record that Plaintiff has difficulty in balance, stooping, kneeling, crouching, crawling and climbing ladders.  AR 63-64.

In response to questions from Plaintiff's attorney, Dr. Wiseman agreed that a person with Plaintiff's impairment would have good and bad days.  Contrary to counsel's suggestion, Dr. Wiseman believed that the ability to stress oneself on one day often makes the next day better with some of the orthopathies and individuals.  Plaintiff's rise from a sedentary level to the light level would be over a period of weeks or months depending on the motivation.  Dr. Wiseman indicated that there may be some degree of pain involved with the knee and back problems.  With respect to questions about the use of a cane, Dr. Wiseman indicated that a walking device is a matter of the amount of difficulty the individual is expressing and has convinced his healthcare giver that he is having.  AR 64-66.

Following Dr. Wiseman's testimony, Dr. Tanenhaus testified regarding the psychiatric impairments involved in this case.  Dr. Tanenhaus indicated that the most significant one is under 12.04, affective disorders, chronic depression.  Plaintiff also has other conditions, but the 12.04 condition is not met and does not rise to the listing level.  With respect to depressive syndrome, Dr. Tanenhaus reported that the following criteria were met:  a loss of interest in almost all activities, the appetite disturbance with change in weight, sleep disturbance, psychomotor disturbance, decreased energy, feelings of worthlessness, difficulty with concentration and thoughts of suicide.  In connecting with the B criteria based on the evidence, including the psychiatric review technique, Plaintiff's restriction of activities due to his depression alone appear to be of a moderate impairment.  Plaintiff had moderate difficulties in maintaining social functioning and concentration, persistence and pace.  Dr. Tanenhaus did not have evidence of repeated episodes of decompensation.  AR 66-67.

In response to questions about work limitations, Dr. Tanenhaus testified that the record showed Plaintiff was capable of simple, repetitive tasks with limited interaction with the public, coworkers and supervisors.  Plaintiff had some difficulty of registering, understanding, recalling and executing

complicated tasks, but mild tasks were no more than minimal degree of limitation.  Dr. Tanenhaus mentioned that documented drug and alcohol abuse had not been significant in more than the past five years.  Dr. Tanenhaus also was aware of statements that marijuana was used to relieve pain. Plaintiff confirmed that he has had a medical marijuana card for three years and smokes marijuana for pain control.  Dr. Tanenhaus added that Plaintiff may have mild impairment in his ability to adapt to new situations.  AR 67-69.

In response to questions from Plaintiff's counsel, Dr. Tanenhaus testified that it often happens that depressed people isolate themselves.  If the depression is severe enough, a person would be spending much of his time immobile.  AR 69-70.

Following Plaintiff's testimony, the ALJ elicited testimony from the vocational expert ("VE") George Meyers.  AR 71.  The ALJ indicated that Plaintiff could not perform his past work, but asked the VE hypotheticals contemplating an individual of Plaintiff's age, education and work experience. AR 72.  In his first hypothetical, the ALJ asked the VE to assume an individual who can do light work with the additional limitation to no more than occasional climbing of ladders, ropes, scaffolds, ramps, stairs, crouching, and squatting and unable to perform any kneeling or crawling.  The VE testified that this person could perform other jobs in the national economy, such as cashier, assembler/small products, and counter clerk/photo finishing.  AR 72-73.

In a second hypothetical, the ALJ asked the VE to add to the first hypothetical that the person is restricted to simple, repetitive tasks, no more than frequent face-to-face interaction with coworkers, supervisors and the public, and is mildly impaired in ability to adapt to the workplace.  The VE testified that cashier and counter clerk positions would be eliminated, but this person could still do the assembler job.  This person also could perform other jobs, such as sewing machine operator and bottle line attendant.  AR 73-74.

Plaintiff's counsel asked the VE to add to both hypotheticals a sit/stand option where the individual would be required have an at-will ability to change positions from sitting to standing. While in the standing position, the individual would have to use the dominant hand to hold a cane. The VE testified that the additions would eliminate the identified positions.  AR 74.  Additionally, if the VE were to add an absenteeism rate of more than two days a month to both hypotheticals, it would

eliminate all jobs in the national economy.  AR 74.  If an individual was impaired in the ability to maintain consistent concentration and pace to the extent that 10 percent of the day they would be off-task due to reactions of pain or drugs, it would eliminate all jobs in the national economy.  AR 74-75.  The VE testified that Plaintiff had transferable skills, but nothing to the light or sedentary positions.  AR 75.

**Medical Record**

The entire medical record was reviewed by the Court.  AR 338-919.  The medical evidence will be referenced below as necessary to this Court's decision.

**The ALJ's Decision**

Using the Social Security Administration's five-step sequential evaluation process, ALJ Snelling determined that Plaintiff did not meet the disability standard.  AR 33-44.  More particularly, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since November 7, 2007, his alleged onset date.  AR 35.  Further, the ALJ identified status post total left knee replacement, degenerative disc disease of the lumbar spine, osteoporosis of the thoracic spine with degenerative changes and old partial compression fracture at T-9, exogenous obesity, sensorineural hearing loss, major depressive disorder, chronic, post-traumatic stress disorder, panic disorder without agoraphobia and marijuana dependence as severe impairments.  AR 35-36.  Nonetheless, the ALJ determined that the severity of Plaintiff's impairments did not meet or exceed any of the listed impairments.  AR 36-37.  Based on his review of the entire record, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform a wide range of light work with no more than occasional climbing of ladders, ropes, scaffolding, ramps or stairs.  Plaintiff was unable to perform any kneeling or crawling and only occasional crouching or squatting.  He was limited to work involving simple, routine, repetitive tasks, which required no more than frequent face-to-face interaction with co-workers, supervisors and the general public.  However, Plaintiff could work in close proximity or along-side them without difficulty.  Plaintiff was little more than mildly impaired in his ability to adapt to workplace changes.  AR 38-44.  The ALJ found that Plaintiff could not perform any of his past relevant work, but could perform jobs that exist in significant numbers in the national

1   economy.  AR 44-45.  The ALJ therefore concluded that Plaintiff was not disabled under the Social

2   Security Act.  AR 45.

3                                    **SCOPE OF REVIEW**

4          Congress has provided a limited scope of judicial review of the Commissioner's decision to

5   deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, this

6   Court must determine whether the decision of the Commissioner is supported by substantial evidence.

7   42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*,

8   402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112,

9   1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as

10  adequate to support a conclusion." *Richardson*, 402 U.S. at 401.  The record as a whole must be

11  considered, weighing both the evidence that supports and the evidence that detracts from the

12  Commission's conclusion.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the

13  evidence and making findings, the Commissioner must apply the proper legal standards.  *E.g.,*

14  *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's

15  determination that the claimant is not disabled if the Commissioner applied the proper legal standards,

16  and if the Commissioner's findings are supported by substantial evidence.  *See Sanchez v. Sec'y of*

17  *Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

18                                       **REVIEW**

19         In order to qualify for benefits, a claimant must establish that he or she is unable to engage in

20  substantial gainful activity due to a medically determinable physical or mental impairment which has

21  lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §

22  1382c(a)(3)(A).  A claimant must show that he or she has a physical or mental impairment of such

23  severity that he or she is not only unable to do his or her previous work, but cannot, considering his or

24  her age, education, and work experience, engage in any other kind of substantial gainful work which

25  exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).  The

26  burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir.

27  1990).

28

In his opening brief, Plaintiff contends that the ALJ erred in (1) granting little or no weight to the physical function assessment of the examining orthopedist, Dr. Senador, (2) evaluating the opinions of Plaintiff's treating and examining psychologists, along with the non-examining psychiatrist; (3) evaluating Plaintiff's credibility.

## DISCUSSION[2]

### 1.    The ALJ Properly Assessed the Opinion of Dr. Senador

Plaintiff contends that the ALJ failed to provide specific and legitimate reasons for granting little or no weight to the opinion of examining orthopedist, Dr. Senador.   (Doc. 11 at 15-16.)

Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians).   *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).   Generally, a treating physician's opinion should be accorded more weight than opinions of doctors who did not treat the claimant, and an examining physician's opinion is entitled to greater weight than a non-examining physician's opinion. *Id.* Where an examining physician's opinion is uncontradicted by another doctor, the Commissioner must provide "clear and convincing" reasons for rejecting the examining physician's ultimate conclusions. *Id.* If the examining doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by substantial evidence in the record. *Id.* at 830–31. The ALJ can meet this burden by setting forth a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

Notwithstanding the above discussion, an ALJ is not required to accept an opinion of a physician if it is conclusory and not supported by clinical findings. *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992). Additionally, an ALJ is not bound to a medical source's opinion concerning a

---

[2]    The parties are advised that this Court has carefully reviewed and considered all of the briefs, including arguments, points and authorities, declarations, and/or exhibits.  Any omission of a reference to any specific argument or brief is not to be construed that the Court did not consider the argument or brief.

claimant's limitations on the ultimate issue of disability. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). If the record as a whole does not support the medical source's opinion, the ALJ may reject that opinion. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004). Items in the record that may not support the physician's opinion include clinical findings from examinations, conflicting medical opinions, conflicting physician's treatment notes, and the claimant's daily activities. *Id.*; *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Connett v. Barnhart*, 340 F.3d 871, 874-75 (9th Cir. 2003); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600-601 (9th Cir. 1999).

Here, Plaintiff contends that the ALJ's rationale for rejecting Dr. Senador's opinion has "no legal or factual basis." (Doc. 11 at 19.) The Court disagrees.

The ALJ summarized and evaluated Dr. Senador's opinion as follows:

> On October 21, 2009, a qualified medical examination (QME) for the claimant's worker's compensation claim was performed by orthopaedic [sic] surgeon Jose J. Senador, M.D., who qualified his findings by stating that "the history and physical examination is not intended to be construed as a general or complete medical evaluation. It is intended for medical legal purposes only . . ." Dr. Senador indicated that "It would appear that the patient's symptoms have dramatically changed since the last time he saw Dr. Konkin in May of 2009. During our evaluation he states that he did not think the surgery relieved his left knee problems; however, the grinding sensation he had before surgery was completely relieved. It is not known when the patient started having problems with his knee again or with his right hip." Claimant ambulated with a limp favoring the right side. He was able to perform heel-walking and toe-walking with a cane. The claimant was able to squat less than 90 degrees on both sides. Dr. Senador then concluded with "[Claimant] will not be able to perform occupations that will require him to be on his feet longer than 30 minutes at a time or one that would require going up and down stairs and ladders, kneeling, squatting, running or jumping, and weight restriction of no more than 40 pounds in terms of lifting, carrying, pushing, or pulling" [Exhibit 21 F]. Dr. Senador, who did the Qualified Medical Examination, is given little weight as he did a one-time assessment in 2009 and did not have the benefit of later records and medical analysis.

AR 42. The ALJ assigned little weight to Dr. Senador's opinion in favor of the contradictory opinion of the non-examining medical expert, Dr. Wiseman, who testified at the hearing. AR 41, 43. In so doing, the ALJ provided specific and legitimate reasons for rejecting Dr. Senador's opinion. First, the ALJ gave Dr. Senador's opinion "little weight as he did a one-time assessment in 2009 and did not have the benefit of later records and medical analysis." AR 42. The lack of longitudinal records is a

legitimate basis for discounting an examining physician's opinion, as the record in its entirety must be considered in evaluating disability claims. 20 C.F.R. §§ 404.1519p.  The ALJ gave substantial weight to the opinion of the non-examining medical expert, Dr. Wiseman, who had the benefit of the medical evidence and medical opinions of other treating and examining physicians.  AR 41.

Second, in crediting Dr. Wiseman's opinion, the ALJ acknowledged that Dr. Wiseman concurred with the opinion of consultative examiner, Dr. Gasparre.  AR 41, 60-62.  Dr. Gasperre opined that Plaintiff had the ability lift and carry 50 pounds occasionally and 25 pounds frequently, sit, stand and walk 6 hours in an 8-hour workday, could occasionally climb ladders and scaffolds, but could never kneel, crouch, squat or crawl because of his knee.  AR 576.  Dr. Gasperre's opinion, which contradicts that of Dr. Senador, serves as an additional specific and legitimate reason for assigning little weight to Dr. Senador's opinion because Dr. Gasperre's opinion was supported by independent clinical findings.  *See, e.g., Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (consultative examiner's opinion alone constituted substantial evidence, because it rested on independent examination of claimant); *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).  To the extent Dr. Gasperre's opinion also was a one-time assessment lacking the benefit of longitudinal records, Dr. Wiseman opined that Dr. Gasparre's 2009 opinion was consistent with more recent opinions.  AR 41, 60-62.  Further, it is the province of the ALJ to resolve conflicting medical evidence.  *Thomas v. Barnhart*, 278 F.3d 947, 957-58 (9th Cir. 2002.)

Third, the testimony from Dr. Wiseman also constitutes substantial evidence supporting the ALJ's decision because that testimony was expressly based on and consistent with the examining physician's opinion and underlying independent findings.  *See Tonapetyan*, 242 F.3d at 1149 (opinions of nontreating or nonexamining doctors may serve as substantial evidence when consistent with independent clinical findings or other evidence in the record).

For these reasons, the Court finds that the ALJ did not err in his evaluation of Dr. Senador's opinion.

## 2.    The ALJ Properly Assessed the Mental Health Evidence

Plaintiff next argues that the ALJ erred in granting little or no weight to the mental function assessments of Drs. Ocskay, Wildman and Harrison.  (Doc. 11 at 20-23.)

Dr. Ocskay

In September 2009, Dr. Ocskay, a psychologist who had been treating Plaintiff since June 24, 2009, prepared an opinion letter directed to the Department of Social Services. AR 601-603. Plaintiff had complained to Dr. Ocskay of suffering from depression most of his life, along with suffering anxiety and panic attacks. Plaintiff reportedly had learned to control them by spending time in his room focusing on his breathing and listening to soothing tapes. Plaintiff appeared to be very uncomfortable and in pain during interviews, frequently shifting position and groaning, grimacing and wincing. He had considerable difficulty getting up from a seated position. Plaintiff also reported being in pain during most of his waking hours, requiring medical cannabis to achieve some relief. Additionally, Plaintiff had a history of alcohol and substance abuse starting at about age 11 and lasting through age 39. Plaintiff appeared to be depressed, distracted and irritable because of chronic pain and associated sleep disturbance. He complained about difficulties with concentration, racing thoughts, memory and the ability to persevere at tasks. He also reported that irritability impaired his interactions with others. AR 601-602. Dr. Ocskay diagnosed Plaintiff with a major depressive disorder, chronic, and panic disorder without agoraphobia. He assigned Plaintiff a GAF of 55. Dr. Ocskay opined that Plaintiff's diagnosis was guarded at best, given the intractability of his lifelong symptoms of anxiety and depression, along with the extensive history of chronic pain. Dr. Ocskay further opined that Plaintiff's condition likely was exacerbated by his difficult financial circumstances and the low probability of significant improvement given those circumstances. AR 602-603.

The ALJ summarized and evaluated Dr. Ocskay's opinion as follows:

Oliver Ocskay, Ph.D., in his letter to the Department of Social Services [Exhibit 10F], saw the claimant during the summer of 2009, the same period the claimant stated he was using no other medications. The claimant said he started to use cannabis to help control the pain from his knee and back problems and that he now has a medical marijuana card [Exhibit 7F]. The claimant reported being in pain during most of his waking hours and had required medical cannabis to achieve some relief and get some sleep at night. He had reported that [Vicodin] upset his stomach and that marijuana provided more relief than other pain killers [Exhibit 10F].

The claimant complained to Dr. Ocskay of depression, anxiety, and panic attacks. Dr. Ocskay noted that the claimant said he had learned to control these conditions by spending time in his room focusing on his breathing and listening to soothing tapes. Dr. Ocskay indicated that the claimant said he had increasing levels of chronic pain for the

past eight years. "He appears to be very uncomfortable and in pain throughout our hour long interviews. He frequently shifts position and groans, grimaces, and winces when he does so. When he has to get up from a seated position he can only do so with considerable difficulty and a great deal of effort and pain." I note that this is in contrast to the claimant getting up and off the exam table without difficulty in May of the same year [2009] with Dr. Gasparre. The claimant appeared to be depressed, distracted and irritable because of the impact of chronic pain and the associated sleep disturbance [Exhibit 10F]. This, after all of the statements regarding marijuana and relaxation techniques being able to control the symptoms and allow sleep.

AR 39-40. The ALJ further evaluated Dr. Ocskay's opinion, stating:

The claimant was seen by his treating psychologist, Dr. Ocskay, during the summer of 2009, who diagnosed him with major depressive disorder, chronic; and panic disorder without agoraphobia, with a GAF of 55. The Global Assessment of Functioning (GAF) is a number scale (0 through 100) used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults. A score in the range of 51-60 indicates moderate symptoms or moderate difficulty in functioning for most adults. Dr. Ocskay is given reduced weight as he does not have a longitudinal history of treatment (one summer) and seemed to have relied quite heavily on the subjective report of symptoms and limitations provided by the claimant. The doctor seemed to uncritically accept as true most, if not all, of what the claimant reported about the length and severity of his symptoms where the medical records as a whole, indicate otherwise. Additionally, the bias of the claimant, as noted in the report where it states that the claimant ". . . is in the process of trying to get disability coverage and medical coverage" evidence the claimant's less than credible statement that he has had lifelong symptoms of anxiety and depression with an extensive history of chronic pain [Exhibit 10F].

AR 42.

Plaintiff first argues that the ALJ erred by incorrectly attributing his statements regarding the effectiveness of relaxation techniques and marijuana use to Dr. Ocskay. Plaintiff contends that Dr. Ocskay's statements "are merely acknowledgments" regarding the use of those techniques, "not claims of their efficacy." (Doc. 11 at 21.) Despite Plaintiff's assertion, the ALJ properly noted the inconsistency in Dr. Ocksay's report, which appeared to credit Plaintiff's symptomology, but not his reported ability to control those symptoms through relaxation and marijuana use. AR 41 ("The claimant appeared to be depressed, distracted and irritable because of the impact of chronic pain and the associated sleep disturbance [Exhibit 10F]. This, after all of the statements regarding marijuana and relaxation techniques being able to control the symptoms and allow sleep"). An ALJ may reject a

treating physician's opinion that is internally inconsistent.  *See Morgan*, 169 F.3d at 602-03; *Johnson v. Shalala*, 60 F.3d 1428, 1433 (9th Cir. 1995).

Second, Plaintiff contends that the ALJ erred by discounting Dr. Ocskay's assessment as based on one summer of treatment.  (Doc. 11 at 21.)  As noted above, the ALJ gave reduced weight to Dr. Ocskay's opinion because he did "not have a longitudinal history of treatment (one summer)."  In assigning weight to a treating physician's opinion, the regulations expressly permit an ALJ to consider the length and frequency of the treatment relationship.  *See* 20 C.F. R. § 404.1527(c)(2)(i) ("When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source").  In this instance, Dr. Ocskay reported seeing Plaintiff on 5 occasions between June and September 2009.  AR 601.

Third, Plaintiff asserts that the ALJ erred by claiming that Dr. Ocskay's assessment seemed to rely heavily on the subjective reports and limitations provided by Plaintiff.  (Doc. 11 at 21.)  Upon review of Dr. Ocskay's letter, it appears that much of the information is derived from Plaintiff's self-reported symptoms and complaints.  AR 601-602.  As the Commissioner notes, Dr. Ocskay did not include any clinical observations, with the exception of Plaintiff's apparent physical discomfort.  AR 601.  An ALJ properly may reject a treating physician's opinion that is conclusory, brief and unsupported by clinical findings.  *Thomas*, 278 F.3d at 957; *Tonapetyan*, 242 F.3d at 1149. There are no clinical evaluations of Plaintiff's mental functioning beyond a GAF score.  Although a GAF score is a rough estimate of an individual's psychological, social and occupational functioning used to reflect the individual's need for treatment, it does not have any direct correlative work-related or functional limitations.  *See Hughes v. Colvin*, 599 Fed.Appx. 765, 766 (9th Cir. 2015) (citing *Vargas v. Lambert*, 159 F.3d 1161, 1164 n. 2. (9th Cir. 1998)).

As a final argument, Plaintiff contends that the ALJ erred by rejecting Dr. Ocskay's assessment because Plaintiff admitted that he was in the process of "trying to get disability" and this statement was at odds with Plaintiff's claim of lifelong symptoms of anxiety, depression and chronic pain.  (Doc. 11 at 22.)  An ALJ may discount a physician's opinion premised on a claimant's properly discounted subjective complaints.  *See Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989).  In evaluating a

claimant's credibility, an ALJ properly may consider evidence of disability-seeking motivation. *Mendez v. Astrue*, No. 1:08cv01784 DLB, 2009 WL 3011246, *13 (E.D. Cal. Sept. 17, 2009).

Dr. Wildman

On October 2, 2009, Dr. Robert W. Wildman, II, a clinical psychologist, completed a consultative psychological evaluation of Plaintiff.  At the outset, Dr. Wildman noted that Plaintiff drove himself to the evaluation session from about 50 miles away and completed the intake paperwork without assistance in a very complete, legible fashion, documenting that Plaintiff did not suffer from a significant deficient in his ability to deal with written materials.  AR 620.  During the evaluation, Plaintiff complained of difficulty concentrating and with memory, along with being anxious and depressed, rating himself a 9 on a 10-point depression-severity index.  However, Plaintiff identified no current psychiatrist/therapist, suggesting that mental health treatment was not ongoing.  In the medical record, Plaintiff indicated that he had been prescribed medical marijuana at the rate of four a day, and explained that it kept him sane, which indicated to Dr. Wildman that Plaintiff found cannabis quite useful.  AR 620-621.

During the interview, Plaintiff focused on his physical problems and reported that his depression had worsened in association with the deterioration in his physical condition.  When Dr. Wildman raised the possibility of vocational rehabilitation, Plaintiff responded, "There's not much I can do.  I can't sit or stand long."  Plaintiff also added, "I'm not a sociable person."  Plaintiff also told Dr. Wildman that he was "fed up" because he had worked all of his life and now has to put up with all of this "BS to get disability."  AR 621.

On mental status examination, Plaintiff did not appear to resemble a genuine psychiatric case because no gross disturbances were noted in his affect or behavior.  Plaintiff reportedly wore sunglasses inside and during the interview.  Dr. Wildman rated Plaintiff's level of alertness as somewhat reduced, with poor posture and hygiene very significantly below average.  His mood was depressed.  He was very indifferent with Dr. Wildman, and communicated in a gruff manner.  On examination of cognitive functioning, Plaintiff was oriented in all three spheres and could describe an ongoing news event.  He was able to recall and repeat three numbers backward.  He successfully completed all four of the serial subtractions from 100 by both 3s and 7s.  He also could reverse the

process through addition.  Dr. Wildman opined that Plaintiff clearly did not suffer from a significant deficit in his ability to deal with written materials.  Plaintiff was not significantly impaired in memory on an intermediate-term basis.  On a long–term basis, he appeared to function at a quite adequate level and proved to be a highly adequate historian.  Plaintiff had a mild to moderate deficit in his fund of information, a moderate deficit in his vocabulary and only a very mild deficit in similarities.  He had no impairment in street smarts and a moderate impairment in proverbs.   AR 622-623.

Plaintiff reported activities of daily living to include the ability to dress and bathe himself, which Dr. Wildman found to be a "somewhat suspicious pattern" because Plaintiff said he could not do household chores, cook, run errands or shop.  AR 624.  Although Plaintiff described himself as almost completely dysfunctional because of his physical and long-term mental problems, Dr. Wildman noted that Plaintiff was able to persist through the evaluation process and sometimes functioned at a quite high level.  Dr. Wildman thought it was quite clear that Plaintiff "could actually function at a significantly higher level in life than he is currently displaying, certainly given his almost total lack of activities as listed in his daily activities."  AR 624.  Plaintiff seemed to be quite resistant to any suggestions that might bring about improvement in his life.  Dr. Wildman believed that Plaintiff was potentially capable of understanding, remembering and carrying out a wide array of detailed instructions.  While Plaintiff was moderately impaired in his ability to interact appropriately with coworkers, supervisors and the public, Dr. Wildman believed a great deal of this problem was actually attitudinal in nature and subject to some kind of therapeutic remediation.  Dr. Wildman also believed that Plaintiff's anxiety and depression resulted in a moderate impairment in his ability to maintain concentration and attention.  AR 624.

The ALJ gave significant weight to the opinion of Dr. Wildman as he had the benefit of examining the claimant and being able to observe the behaviors and responses during the examination process.  AR 43.  Despite affording Dr. Wildman's opinion significant weight, Plaintiff argues that the ALJ failed to take into account Dr. Wildman's finding that Plaintiff is moderately impaired in his ability to maintain attention and concentration.  (Doc. 11 at 22.)  As an initial matter, the ALJ was not required to discuss every piece of evidence.  *See Howard v. Barnhart,* 341 F.3d 1006, 1012 (9th Cir. 2003).  More importantly, however, the ALJ's RFC, which included a restriction to work involving

simple, routine, repetitive tasks, is consistent with the medical evidence.  *See Stubbs–Danielson v. Astrue*, 539 F.3d 1169, 1173–74 (9th Cir. 2008) ("assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with the restrictions identified in the medical testimony").  As noted by the ALJ, Dr. Wildman believed that Plaintiff could actually function at a significantly higher level and was potentially capable of understanding, remembering and carrying out a wide array of detailed instructions.  AR 43, 624.  In other words, Dr. Wildman's opinion supports, at the very least, that Plaintiff could perform simple, routine, repetitive tasks.  Further, the ALJ accorded substantial weight to the opinion of the mental health expert, Dr. Tanenhaus, who testified that Plaintiff was capable of simple, repetitive tasks.  AR 43, 67-69.  Additionally, the ALJ relied on the opinion of the reviewing state agency physician, Dr. Harrison, who opined that Plaintiff had moderate difficulties in maintaining concentration, persistence or pace, but maintained the cognitive skills sufficient for simple, uncomplicated tasks.  AR 632, 641.  Accordingly, consistent with the medical evidence, the ALJ appropriately accounted for moderate limitations in concentration and attention by limiting Plaintiff to simple, routine and repetitive tasks.  *Stubbs-Danielson*, 539 F.3d at 1173-74; *Hughes*, 599 Fed.Appx. at 766 (ALJ's RFC took into account claimant's mental functional limitations, including moderate difficulties in social functioning, concentration, and persistence, by restricting her to simple, routine, repetitive tasks in a job where she could work independently with no more than occasional public interaction); *Lewis v. Colvin*, No. EDCV 14-01326(GJS), 2015 WL 4164682, *5 (C.D. Cal. Jul. 9, 2015) (ALJ appropriately translated moderate limitations into a restriction to simple, routine, repetitive tasks).

        Dr. Harrison

        On November 4, 2009, Dr. Harrison, a state agency reviewing physician, completed a Psychiatric Review Technique form.  AR 633-643. Dr. Harrison opined that Plaintiff had moderate restriction of his activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace and one or two repeated episodes of decompensation, each of extended duration.  AR 641.

        On the same date, Dr. Harrison completed a Mental Residual Functional Capacity Assessment form.  AR 630-632.  Dr. Harrison opined that Plaintiff was moderately limited in the ability to

understand and remember detailed instructions, moderately limited in the ability to carry detailed instructions, moderately limited in the ability to maintain attention and concentration for extended periods and moderately limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  AR 630-631.  Dr. Harrison further opined that due to Plaintiff's chaotic childhood, history of drug and alcohol abuse, current depression and chronic pain, Plaintiff would have difficulty sustaining detailed tasks, but cognitive skills sufficient for simple uncomplicated tasks.  Plaintiff did not have any significant social difficulties.  AR 631.

Plaintiff argues that the ALJ failed to account for Dr. Harrison's finding that Plaintiff was moderately limited in his ability to complete a normal workday and workweek without interruption. (Doc. 11 at 22-23.)  As discussed above, despite finding moderate limitations, Dr. Harrison opined that Plaintiff's cognitive skills were sufficient for simple, uncomplicated tasks.  AR 632.  Therefore, the ALJ's determination that Plaintiff was limited to simple, routine, repetitive tasks appropriately accounted for Dr. Harrison's moderate limitations and his corresponding opinion that Plaintiff had cognitive skills sufficient for simple, uncomplicated tasks.  *See Rodriquez v. Colvin*, No. 1:13–CV–01716–SKO, 2015 WL 1237302, at *6 (E.D. Cal. Mar 17, 2015) (finding that "a moderate limitation in the ability to complete a workday or workweek without interruption is consistent with and properly captured by a limitation to simple repetitive tasks").

### 3.      The ALJ Properly Discounted Plaintiff's Credibility

As a final matter, Plaintiff argues that the ALJ failed to provide clear and convincing reasons for an adverse credibility determination.  (Doc. 11 at 25-26.)  Contrary to Plaintiff's assertion, the Court finds that the ALJ provided clear and convincing reasons for rejecting Plaintiff's subjective testimony.

The ALJ must engage in a two-step analysis to determine the credibility of a claimant's subjective pain or symptom testimony. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir.2007). First, the claimant must provide objective medical evidence of his impairment that could reasonably be expected to produce some degree of the symptom or pain alleged. *Id.* Second, if the claimant satisfies the first step and there is no evidence of malingering, the ALJ may reject the claimant's

testimony regarding the severity of his symptoms by providing specific findings and stating clear and convincing reasons for doing so. *Id.* The ALJ must state which testimony is not credible and what evidence in the record leads to that conclusion. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991). Other factors the ALJ may consider include: a reputation for truthfulness, any inconsistencies in testimony or conduct, daily activities, work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the Plaintiff's symptoms. *Thomas*, 278 F.3d at 958-59.

At the second step of the credibility analysis, the ALJ properly considered inconsistencies between Plaintiff's statements and the medical record as one reason for discounting the severity of Plaintiff's asserted symptoms and their alleged effect. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) ("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects"); *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis"). Here, the ALJ relied on the findings of Dr. Wildman, the consultative psychological examiner, noting that Dr. Wildman thought it "was quite clear that this [claimant] could actually function at a significantly higher level in life than he was displaying, certainly given his almost total lack of activities in his daily activities [Exhibit 14F]." AR 39. In his examining report, Dr. Wildman indicated that Plaintiff was able to dress and bathe himself and drive, which was "a somewhat suspicious pattern in that he says he cannot do household chores, cook, run errands, or shop." AR 624. Dr. Wildman also opined that "it is quite clear that [claimant] could actually function at a significantly higher level in life than he is currently displaying, certainly given his almost total lack of activities as listed in his daily activities." AR 624.

Additionally, the ALJ cited Dr. Wildman's belief that Plaintiff seemed to be "quite resistant to any suggestions that might bring about improvement in his life, however and unfortunately." AR 43, 624. An ALJ properly may consider the issue of motivation in assessing credibility. *Matney*, 981 F.2d at 1020.

As another apparent reason for discounting Plaintiff's credibility, the ALJ cited to Plaintiff's bias or disability-seeking behavior in relation to his mental health impairments.  AR 42.  As discussed previously in this opinion, an ALJ properly may consider evidence of disability-seeking motivation evaluating a claimant's credibility.  *Mendez*, 2009 WL 3011246 at *13.  In this case, the ALJ identified bias or disability-seeking behavior in the report of Plaintiff's treating psychologist, Dr. Ocskay, which noted that Plaintiff was in the process of trying to get disability coverage and medical coverage.  AR 42, 601-603.  The ALJ believed that this evidenced Plaintiff's less than credible statement that he has had lifelong symptoms of anxiety and depression with an extensive history of chronic pain.  AR 42.  In other words, it is clear that the ALJ considered Plaintiff's symptom statements to Dr. Ocskay to be an effort to secure disability coverage.

As an additional reason for discounting Plaintiff's credibility, the ALJ considered statements regarding Plaintiff's use of marijuana and non-traditional treatments in lieu of other medications.  AR 39.  A claimant's reliance on only marijuana to treat symptoms may constitute a specific, clear and convincing reason to discount symptom testimony. *Cole v. Astrue*, 395 Fed.Appx. 387, 389 (9th Cir. 2010); *Stafford v. Colvin*, No. 1:14-CV-3150-JTR, 2015 WL 5330545, *5 (E.D. Wash. Sept. 14, 2015).  In particular, the ALJ considered Plaintiff's admission in May 2009 that he used medical marijuana for his pain and no other medications.  AR 39, 576.  The ALJ also considered Plaintiff's reports during the summer of 2009 that marijuana provided more relief than other pain killers, gave him some relief and allowed him to sleep at night.  AR 39.  At the hearing, Plaintiff admitted his ongoing marijuana use for pain.  AR 68.

Additionally, the ALJ considered Plaintiff's inconsistent claims in October 2009, when Plaintiff initially reported to Dr. Wildman that he had given up his practices of taking cocaine, amphetamines, methamphetamine, LSD and marijuana, but subsequently reported to Dr. Senador that "he takes cannabis to take the 'edge' of his pain." AR 621, 741.  Inconsistent testimony concerning drug use can support negative conclusions regarding credibility.  *Thomas*, 278 F.3d at 959.

Finally, the ALJ considered that as the late as March 17, 2011, Plaintiff reported back pain and depression, but the only ongoing treatment was medication, diet and exercise.  AR 40.  The ALJ's statement appears to discount Plaintiff's credibility based on conservative treatment.  Although an ALJ

properly may consider conservative treatment in assessing credibility, this is not a situation in which Plaintiff is merely relying on over-the-counter medications or other conservative means.  *See, e.g.*, *Tommasetti*, 533 F.3d at 1040 (response to conservative treatment, which included physical therapy and use the anti-inflammatory medication, a TENS unit and lumbosacral corset, undermined claimant's reports regarding disabling nature of pain); *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) (ALJ properly discounted severity of impairment where physical ailments were treated with an over-the-counter pain medication).  The March 2011 record cited by the ALJ includes a prescription for methadone to treat pain.  Prior to that time, Plaintiff had been taking Vicodin and then Percocet for pain.  AR 813-815.  Subsequent records reflect that Plaintiff continued to undergo opiate therapy, with prescriptions of methadone and venlafaxine.  He also was to undertake radiofrequency ablation for his back pain.  AR 811-812, 813.  Based on this record, the Court cannot conclude that Plaintiff was receiving conservative treatment.

However, even assuming the ALJ erred with regard to the characterization of Plaintiff's treatment, that error is harmless where the other reasons offered are proper and are supported by substantial evidence.  *See Carmickle v. Commissioner of Social Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) (citing *Batson v. Comm. of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004) ("So long as there remains 'substantial evidence supporting the ALJ's conclusions on . . . credibility' and the error 'does not negate the validity of the ALJ's ultimate conclusion' such is deemed harmless and does not warrant reversal")).

///
///
///
///
///
///
///
///
///

1

### <u>CONCLUSION</u>

2

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial

3

evidence in the record as a whole and is based on proper legal standards.  Accordingly, this Court

4

**DENIES** Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.

5

The Clerk of this Court is **DIRECTED** to enter judgment in favor of Defendant Carolyn W. Colvin,

6

Acting Commissioner of Social Security, and against Plaintiff David Evans O'Neil, Jr.

7

8

IT IS SO ORDERED.

9

Dated:   __September 23, 2015__         ____/s/ *Barbara A. McAuliffe*____

10

UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24